Good morning. Mark Yannis for Mr. Hightower and May it please the court. It seems this case comes down to a question as whether the district court's impossession of its sentence was procedurally reasonable because it failed to determine the scope of Mr. Hightower's agreement with the company and hold him liable for all $2 million that the entire company made during his employment or whether his liability only extends to a portion of it. It seems to me that Mr. Hightower's claim that the district court's impossession of the $2 million that Mr. Hightower's agreement with the company and hold him liable for all $2 million that the entire company made during his employment or whether his liability only extends to a portion of it. And can't he be held responsible across the board for everything that took place? Well, that is the threshold question, is whether he can be. And the court did not make that determination. That was the, as I understand it, that was the initial procedural question it had to determine was the scope of Mr. Hightower's agreement with the company. Yes, and what did the court hold about that? Well, it didn't seem that anybody ever really discussed scope other than tangentially. There was a good deal of discussion on whether the losses were foreseeable. And it seems that there is, it was almost like the case was conflated with a conspiracy case. But it's a two-prong approach, and it seems that there just was not anything, any meaningful discussion or proof as to the scope of Mr. Hightower's agreement with the company. Well, I think the question is, is this case really on the facts more analogous to Blitz or the facts in Steadley? And remember, Blitz is a case where the person who was working for the company was receiving a salary and had some responsibility for the whole workings of everybody. Whereas in Steadley, he didn't design the scheme. He wasn't responsible for the others. He was paid on a commission basis. And so it's really, which case does this case come under? And did, and secondly, did the district court make a particularized finding of his responsibility under the relevant conduct? Well, I think the Governor and I, Government and I obviously disagree on whether Steadley or Blitz is more like this case. But it seems to me that Steadley is far more on point in that, well, they go over the discussion at 1013 and Blitz, talking about how in Steadley the defendant didn't design any of the activities or the scheme, didn't work to further the scheme outside of his own sales efforts, worked on a pure commission basis. Received no profits. And he competed with other salesmen for commissions. And that is, excuse me, very, very close to what we have in our case. And I also, the commission aspect is a big thing versus the salary in Blitz. And the reason for that is that there was testimony that Mr. Hightower received commission only for the deals that he worked on. He competed with other salespeople. And the salespeople were very territorial about their leads. How long was Mr. Hightower, was Mr. Hightower involved with this company? He was there for three years. Okay. Three years. Was he physically present when they were working out of the motel and the other offices? Yes. He was physically present. So he would have been interacting with other people. He would have been interacting. He knew the whole thing was a scam. Yes. He asked if he could work on some legitimate business. Right. He knew about it. But that's not, his knowledge is not the dispositive point. And that's made in the brief in some case law. He may have known about this. And, of course, it's a bad thing that he knew about it. And perhaps it's something to factor into the analysis as a whole. But the bottom line is that half of this inquiry was to determine what criminal activity he jointly agreed to undertake. And that's the problem is he worked on his own stuff. He made, I think, one year $19,000, while Bivona and Hillman were making these huge bonuses. Counsel, the relevant sentencing guideline here, as I see it, is 1B1.3. And there are a number of examples that are appended to that section of the sentencing guidelines. And one has to do with people who are selling fraudulent stocks. It's actually example number C2. And that example seems to be quite close here. That is, that if you have two people who are working together on a fraudulent scheme and one sells more than the other, that they both can be held liable for the entirety. Now, why isn't that example just applicable here? I don't exactly recall that illustration, or it sort of comes to mind. But if I remember right, those people were working together on they were entangled on a particular deal. Well, what it says is C2. It says defendants F and G working together designed and executed a scheme to sell fraudulent stocks by telephone. They're both accountable for the entire amount. I don't have the PSR, but I'm wondering to what extent did your client design the scheme or have responsibility for the overall scheme? And was he present throughout the entire period of loss for which he was held accountable? I think he worked at that location. And so I think his presence isn't really not an issue. Again, there's case law that says that presence may be a factor, but it's not determinative. But back to your What I'm trying to get to is did he participate in the design of the scheme or did he Right, he did not participate. That's what I was getting back to, Lizzie. Out of your head, yes. I'm sorry. No. No, he did not. Let's make that clear, Lizzie. He did not participate in the design. Was he present at the beginning of the development of the scheme? What does the PSR say? I don't have it with me. Oh, my goodness. I don't know whether he came in at some point afterward. I had thought he had come in at some point afterward, that he was an employee that came in. It seems to me that it makes a difference that if you're looking at those two cases and applying this relevant conduct, particularly the section that Judge Bybee points to, we need to know whether he can't have closely he comes to that fact situation. You should be able to tell us that. Well, I feel like he doesn't come very close to that. I don't want to know what you feel. I want to know what are the facts. Well, as I said, he's a commission only salesman. He worked only on his own leads. He was there for three years. Was he physically present at the site, at the office that they were using? It was a motel room for a while. He was physically present. Okay. And there were other people in the room who had been making phone calls? They would have had the people who were doing the research would have been around? Sir, he knew. Yes, he knew about it. He would have had interaction with many of the other people who were involved in the conspiracy? Yes. If I might, this Court's unpublished case in Viesa said that the broad attribution of liability was improper. In quoting it says mere knowledge of the illegal acts is not enough to create responsibility. And the Court said we have held that employees who work in an interdependent scheme may be responsible for illegal acts of others, but unlike the Swindlers and Blitz, Viesa was paid on a commission basis and worked independently from the other participants. And they said that that was an error. And, again, this is an unpublished case, but it certainly has, is factually similar and it has some persuasive value. And it does drive home the point that the presence, the mere presence is not, it makes them look bad, but it's not the inquiry. I also cannot emphasize enough, though, that this is a, again, a two-prong inquiry. And the case was, the sentence was procedurally unreasonable because the Court did not make a preliminary determination of the joint, the activity that he jointly agreed to undertake. Rather, what they did was took an entire amount. Agent Gonzalez came up with a $2 million figure, the entire amount, that was made while Mr. Hightower worked at the company and didn't break out anything in terms of what Mr. Hightower actually worked on. What the Court did was they took that amount and worked backwards from it. And they said, well, he didn't have anything to do with the United Defense, so we're going to go ahead and downward depart. That was not a procedurally reasonable way of going about this. It should have been, it should have been where they, where they started at the point where they figured out what he did agree to jointly undertake. And that was never done. And that, to me, is enough to remand for resentencing under the guidelines that they, it's not enough to say we're going to take this entire amount and we're going to give him a break for the United Defense case and we'll work backwards. The problem there, and this also goes to harm, is that they didn't give him, we don't know if they gave him enough of a break. It looks like if he had been held responsible for only his, the sales he worked on, he could have been, rather than a 51-month base sentence, I had figured it could have been, I think, in the 27 to 33-month range. And that's why, that's why the case was not procedurally sound. Are there any other questions? Do I have any questions? No. Okay. Thank you very much, Counsel. Thank you. Good morning. May it please the Court, Carrie Curtis-Axel on behalf of the United States. I'd like to begin with, based on the Court's just recent discussion, a point we made in a footnote about the standard of review. And stay with me for a second. To the extent that the issue here is whether or not the Court explicated its findings sufficiently, as opposed to whether it considered the relevant conduct standard under 1B1.3, then that should be reviewed for plain error. What happened below is that the defendant did challenge the application of relevant conduct, whether all the losses should be attributed to him. And that's addressed in the PSR. That's thoroughly discussed in the record. But what he framed it as is foreseeability. And so Counsel just referenced that the discussion is about foreseeability. And the discussion is about foreseeability because that's how the defendant raised the question. We debated whether to argue that this should be reviewed for plain error, plain and simple, for that reason alone. And we concluded that the issue of whether or not he should be charged with the conspiracy's losses was preserved. And so we didn't argue as a matter that plain error applies to this entire question. But really, and the record is replete, I think, in both the PSR, what the government put in the record in the sentencing transcript, what the Court discussed, that the Court was considering both the jointly undertaken activity and foreseeability. That's discussed. But to the extent it's just a matter of whether the Court explained adequately that he considered the scope of the agreement that defendant jointly undertook, he wasn't asked to say that. No one raised that. The defendant did not raise that. And so we cited Valencia-Barragan for that principle. Okay. So he could have been held accountable for this full range of activity under the conspiracy count or under a substantive count under the relevant conduct theory. The relevant conduct theory applies to both the conspiracy and to the malefried wire fraud count. Wait, but foreseeability comes in to what? To which one? To both? To both. Okay. Because relevant conduct is used to determine the scope of the losses attributed to him, whether we consider it under the conspiracy count or the malefried count. The same provisions of the guidelines would apply. And I did also want to answer the one of the questions that I actually think it was you who had, Judge Wardlaw. Was he present the whole time for this loss? He was. What the loss analysis does was it put all the victims together who paid. This is just actual loss. And then the agent allocated just the period of time that defendant worked in the conspiracy. And the $2 million is just for that period of time where he was physically present and part of the conspiracy. So to go back to this question that I have, because I'm trying, you know, I'm still trying to distinguish the two cases steadily and let's, and looking at the illustration C2, it talks about defendant F&G, it's a telemarketing scheme, but it was fraudulent stocks and it says, working together, design and execute. And then it, it holds them both responsible for the entire, and I was getting to the specific question of his involvement in the design of this scheme. Well, to the extent design means did he conceive it in his head and come up with it? I would say there's no evidence in the record of that. But to the extent he designs in terms of continuing to have input into the ads that are designed, he does have that kind of input. I want to remind the Court that there is an example of the newspapers. This is a newspaper, a false newspaper scheme, and then a false billing scheme in which the bills claim that ads have been run in newspapers that haven't been printed. When he starts in the conspiracy in 2003, they're working on 2002 newspapers, meaning they're calling people and saying, you owe for ads that you authorized in 2002 papers. Those papers don't even exist yet. And no papers exist until he and the salesman together fill them up. And so as an example of that, in the excerpts of record, the government has an invoice followed by a newspaper at GER442 at SEC. That newspaper, the American Black Employment Journal, was sent to a victim with a claim, your ad's in this, you need to pay. And that ad is also full of all the other salesman's ads. So but for the interaction of all those salesmen to fill up this publication, but for Tamara Cox, who actually does the copy work, and Tregan Allen, there's nothing for defendant, there's no scam for defendant to do. Is there, so what's, is this a real newspaper, or are they created after the fact? They create them after the fact, and they, if they print it all, they would print after the fact. And they would print in instances such as this where the victim would only pay if they actually saw a real newspaper. There's two ways for the victims to pay. One is if they could do proof of publication based on just a fake tear sheet. And there's an example of that in the record also, too, with respect to Children's Defense Fund, one of the victims the court focused on that was a charity beginning at GER389. And that's a situation where they just send a fax, and it has an eight and a half by 11 mock-up of what, this is the ad we ran for you. Most of the time in the scam at that point, there's no paper that even exists. That's just something that Tamara Cox creates when the salesman asks her to do that so that he can backdoor the victim. When the salesman first makes the call, there's no paperwork at all that exists. And so sometimes the victims pay just on receiving that fax. Sometimes they say, no, you have to send me a real newspaper. And at that point, that would wait until the newspaper had been filled up. Defendant Bivona, the lead defendant, would wait for a sufficient amount of ads to actually cause that to happen. So they would wait for the rest of the salesman to have contacted other victims and had to create the ads to put it all together. Correct. Okay. He wasn't going to pay for that unless there were enough ads to fill up a publication. So it took cooperation of the various people to make it work. Yes. Yes. This is not the kind of scheme where, perhaps as in Steadley, the person gets a piece of paper, an invoice, or I think in Steadley it was just picking up the phone based on ads. But you can conceive of a scam where somebody's handed an invoice, told to collect on it, and only ultimately finds out that it's false. This is not that. There's nothing even created, and the salesman knows that until he places that call. And then he has to interact with the staff who does all of that graphic design work, because it's a newspaper. There was also a question about the court's approach and what was really kind of going on here. And as I read the transcript, and my understanding at the time, as I was trial counsel also, was the court really here was basically concerned about relative culpability. There had been this was the sixth of seven people in this scheme to be sentenced. But he didn't sentence them all, right? Another judge was sentencing some of them. Correct. I think the other two salesmen who were primarily discussed were sentenced by Judge Takasugi, and then Judge Wu sentenced some of the other people that came later, including this defendant. And so I think the court was troubled and bothered by the fact that accepting and applying 1B1.3 to this case and determining it falls under Blitz would set the guidelines range so high. And so he said, let's talk more about where we're going to come out. And then when you read the hearing, it's really a discussion about how does this defendant compare to the other defendants, and why would we charge him with the same sentence that Richard Bivona, the ringleader, got. And ultimately he says, you know, that's what I want to talk about. I don't want to charge him. Even though these losses may be foreseeable, it seems unfair, so to speak, to charge him with the full scope of losses, at which point, you know, we remind him that that is what the guidelines requires. And then the court ultimately does follow the guidelines, applies 1B1.3, adopts the PSR, but then downwardly departs to get to a sentence that seems fair vis-a-vis the other sentences. And so you see 36 months, 41 months, and 51 months from the guy who went to trial. That's not an unreasonable range, I would submit. If the court has no further questions for me. Questions? No. No. Thank you. Thank you. U.S. v. Hightower will be submitted, and we'll take up U.S. v. Bivona.
judges: Fletcher, Wardlaw, Bybee